D. A. TOMPKINS CO. et al. v. CHESTER MILLS.

(Circuit Court, D. South Carolina. October 20, 1898.)

1. INSOLVENT CORPORATIONS—CREDITORS' SUITS—COSTS AND ALLOWANCES.
   Where, in a creditors' suit for the distribution of the assets of an insolvent corporation, the several bondholders were represented by different counsel, each will be required to pay his own counsel, and no allowance therefor will be made from the funds in the hands of the court.

2. SAME—MORTGAGE TRUSTEES.
   Where the mortgage bondholders of an insolvent corporation had been called in, and had appeared and proved their claims in a creditors' suit before the trustee in the mortgage became a party, and his appearance was merely formal, for the purpose of perfecting the title to the property

sold, such trustee will not be allowed commissions on the sale, and only nominal fees and expenses, from a fund which is insufficient to pay the mortgage debt in full.

**3. SAME—CONTRIBUTION TO EXPENSES OF COMPLAINANT.**

An unsecured creditor of an insolvent corporation which had ceased doing business, who, before a right of action had accrued in favor of its bondholders, commenced suit for the appointment of a receiver to preserve its assets, and to have them applied to its indebtedness according to priority, in which suit the mortgagees and all other creditors afterwards joined, will be allowed a contribution towards his expenses from the fund realized, although the assets are insufficient to reach his claim in the distribution.

This was a creditors' suit for the conservation and distribution of the assets of defendant, an insolvent corporation. On final adjustment of costs and allowances.

H. B. Tompkins and Wilson & Wilson, for complainants.

A. G. Brice and H. Clarckson, for trustees.

Jones & Tillett, Mordecai & Gadsden, and Lord & Burke, for bond-holders.

SIMONTON, Circuit Judge. This case comes up for final adjustment of the costs as between solicitor and client. The Chester Mills, an incorporated manufacturing company, was unfortunate in its business, and was compelled to close operations in June, 1897. The mill was then shut down, and no business whatever was done, and there were no prospects for resumption. At that date the Chester Mills property was covered by two mortgages: One, a first mortgage, dated 1st November, 1894, given to secure certain coupon bonds, in the aggregate $50,000, with coupons attached, payable on 1st days of November and May in each year; the other a second mortgage dated the same (1st November, 1894), issued to secure bonds in the aggregate $50,000, with coupons thereon payable semiannually. The coupons on the first mortgage bonds, maturing 1st May, 1897, were paid. Whether all of these were paid by the corporation, or whether Messrs. Woodward, Baldwin & Co. paid those numbered 1 to 91, inclusive, and 96 to 100, inclusive, does not yet appear. But no default in payment of coupons at that date was declared. Apparently all of the coupons on the second mortgage bonds are past due and unpaid. Besides these mortgage bonds and coupons, the corporation owed a large floating debt, unsecured. On 23d September, 1897, before the maturity of the coupons on the mortgage bonds, the D. A. Tompkins Company, a corporation of the state of North Carolina, an unsecured creditor to a large amount, filed a creditors' bill against the Chester Mills; averring its total insolvency, and praying that its affairs be wound up, and the rights of creditors be adjudicated and settled, and that meanwhile a receiver be appointed. The bill sets out the existence of the mortgages, but does not make the trustees of these mortgages parties. The fact that they were all citizens of North Carolina, the same state with complainant, will explain why they were not made parties defendant; and the further fact that, inasmuch as the inability to pay maturing coupons had not yet been declared, the trustees could not become co-complainants in this suit. The bill, however, prayed that

after a sale of the property of the insolvent corporation the proceeds thereof should be applied to the discharge of all valid liens according to their respective priorities. No resistance was made in the progress of the cause. The injunction issued. The receiver was appointed and took charge. On 19th September, 1898, the trustees of the first and second mortgages intervened, and were made parties complainant, and shortly thereafter an order for sale was made. Before the intervention of the trustees, the bondholders had been called in; and with few, if any, exceptions, all proved their bonds.

It is evident that there never has been anything but a technical controversy in this case, that all the main facts were admitted, and that all parties concurred in the same object,—the best and speediest mode of winding up and settling the affairs of an insolvent corporation. There was no fund to be sought, discovered, realized, and distributed. All the property of the Chester Mills was in sight; all its liens on record, their priorities unquestioned. No bondholder nor class of bondholders represented any but his or their own interest. The trustees came in at the eleventh hour, after all the bonds were in, and contributed the dry legal title in the mortgages. Under these circumstances the court is not called upon to any extraordinary or extravagant disposition of the funds under the control of the court. It is generally admitted that all of the property will accomplish little more than to pay the costs of the case, and a dividend on the first recorded lien.

Counsel for bondholders: The bondholders were represented by several firms, working independently for a common object, representing interests called in by the court. It is clear that they can claim compensation from their respective clients, and not out of the fund. Why should the Chester and Charlotte bondholders, who had their own counsel, contribute to the payment of the counsel for the Charleston bondholders, or vice versa? Each counsel representing bondholders labored for the interest of his own client. They have the right to an order that before distribution to their clients they be paid their compensation. They have a well-known recognized lien thereon. They have no claim or lien on funds going to other bondholders. "No one," says the supreme court of South Carolina in the well-considered case of Hand v. Railroad Co., 21 S. C. 179, "can legally claim compensation for voluntary services to another, however beneficial they may be, nor for incidental benefits and advantages to one flowing to him on account of services rendered to another by whom he may have been employed. Before legal charge can be sustained, there must be a contract of employment, either expressly made, or superinduced by the law upon the facts."

As to the trustees: Trustees, having no personal interest, are always recompensed for services, and are reimbursed for expenses incurred, in protecting, preserving, or securing a common trust fund. They are thus protected because they represent all their cestuis que trustent. Trustees v. Greenough, 105 U. S. 536; Cowdrey v. Railroad Co., 93 U. S. 354. And only because they are such representatives. But if the cestuis que trustent themselves are present, and themselves represented by their own counsel their own interest, and this by the

leave or with the consent of the court, the reason for the rule ceases. In the case at bar all the bondholders who can share in this fund are present. The trustees came in, not representing them. But, as they held the legal title in the mortgage, it was necessary that they should come in to perfect the sale. They are entitled to reimbursement for employing counsel. They are not entitled to any commissions. To this end, considering how essential their presence is, they are allowed $400.

Complainants: This corporation was utterly insolvent. Its operations were suspended, its machinery idle and deteriorating, its property exposed to decay and destruction by the elements. The trustees of the mortgage could not act. By its terms there must have been default, and the request of one-third of the holders of the bonds to induce action on their part. The bondholders could not act, as the coupon maturing before this casualty had been paid. No one could act but a creditor holding a past-due unsecured debt. The complainants acted, filed this bill, and set the machinery of the court in operation, which led up to the inevitable result. All partake in the result. All stood by and acquiesced. Under these circumstances the complainant is entitled to a contribution out of the fund towards its expenses,—contribution, not compensation, for no fund was created. Nor can this contribution be large, for it is paid at the expense of a recorded lien, upon which is cast all the expenses of this suit. Let the complainant be paid out of the proceeds of sale, in addition to its costs, the sum of $600.